IN THE

# SUPREME COURT OF JUDICATURE

OF THE

# STATE OF INDIANA,

AT INDIANAPOLIS, MAY TERM, 1865, IN THE FORTY-NINTH
YEAR OF THE STATE.

---

### BICKEL *v.* SHEETS.

| 24 | 1 |
|---|---|
| 125 | 351 |

GAMING CONTRACT.— A contract for the sale of property intended to be used
for the purpose of gaming is not void under the statutes of Indiana,
though the seller at the time of sale was informed of the purpose to
which the property was to be applied.

SAME.— Where a thing is sold under such circumstances as to make the
seller an accessory before the fact to a felony, he cannot recover the price.

APPEAL from the *Huntington* Common Pleas.

GREGORY, J.—The summons was returned not found as
to *Wrede*. *Bickel* answered as follows: " That he admits the
execution of the note sued on, but that said note was given
for and upon an illegal consideration, in that said note was
given for and in consideration of a gaming table, known as
a billiard table, for the purpose of being used in wagering
articles of value thereon, contrary to the statutes of the
State of Indiana, subversive of public morality, and leading
to the commission of crime."

The plaintiff below demurred to the answer, the justice
sustained the demurrer and the defendant excepted.

VOL. XXIV.—1

The plaintiff, notwithstanding the demurrer was sustained, filed a reply to the answer, denying each and every allegation therein. The trial before the justice resulted in a judgment in favor of the plaintiff, for the amount secured by the note. Appeal to the Common Pleas Court. No notice was taken of the demurrer in the Common Pleas Court, but the transcript of the record says, "*the issue in this behalf being joined,* and neither party requiring a jury, this cause is left to the summary determination of the Court," &c. Finding for the plaintiff. Motion for a new trial overruled. The evidence is in the record.

The appellant is the only witness. He testified as follows: "I am the defendant in this action; the note in suit was given in consideration of a billiard table sold to me by the plaintiff. I told him that some of my friends wanted me to get a billiard table for them to game on, in my saloon, which I was then keeping, and that I wanted to buy one for that purpose, which he proposed to sell me. I asked him how it could be used in that way, so as to make money out of it. He said that I could charge ten cents per game, and that they usually played for the liquor, for which I would get pay besides. For this purpose I bought the billiard table, and gave the note in suit. I stated to him at the time that I wished to use it for gaming."

The misdemeanor act provides that "every person who shall be the keeper or exhibitor of any gaming table, roulette, shuffle board, faro bank, nine pin or ten pin alley, or billiard table, *for the purpose of wagering any article of value thereon,* shall be fined," &c. 2 G. & H., § 74, p. 477.

In the case of *Cummings* v. *Henry,* 10 Ind. 109, this court held that a contract of sale of property intended to be used for the purpose of gaming, is not void under our statutes. The question arose on the following instruction: "If *Cummings* sold the mare to *Henry* as a race nag, for the purpose of being run on a wager for money, or property, and *Cummings* knew that fact, the contract is void, as being against public policy." HANNA, J., in delivering the opinion

of the court says: "In the case at bar, the distinction does not appear to have been sufficiently kept up between transactions in which the sale and the illegal acts are so mixed and blended as to form really but one contract, and those where the sale and the illegal act are distinct, and do not necessarily, by the contract, form part of the same transaction. No doubt a contract expressly providing that a race should be run for a wager would be void, as if the contract of sale in this case had been made by the vendor to depend upon, or be connected with, the result of a race for a wager.

"If a mechanic were to sell guns to persons whom he knew proposed target shooting for a wager, we cannot believe he would be remediless by the laws in force in this state, when he should seek to recover the price of such guns.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"The consideration of this contract was not a wager, nor that a race should be run for a wager, but it was the delivery of the animal, which might perhaps be used for that purpose. The consideration of the note is not therefore wicked in itself, nor is the sale of a horse prohibited by law.'

The sale of a billiard table is as lawful as the sale of a race-horse. It is not unlawful to own and keep it, but it is unlawful to keep it *for the purpose of wagering any article of value thereon.* There is nothing in the distinction attempted to be drawn by counsel, between the case at bar, and the one just cited. A billiard table may be used for recreation, a purpose as legal as any purpose to which a race-horse can be put. And the question is, shall this case be overruled. If this was an open question, unembarrassed by previous ruling, our decision might be different from our present determination, for we are free to confess that the weight of authority is against the right of recovery in the case in judgment.

The rulings of *Lord Mansfield* in the cases of *Holman et al..*

v. *Johnson,* Cowper's Rep. 341, and *Hodgson* v. *Temple,* 5
Taunton R. 181, cannot on any principle be reconciled with
the rulings of *Chief Justice Eyre* and *Lord Ellenborough* in
the cases of *Lightfoot* v. *Tenant,* 1 Bos. & Pull. 351, and
*Langton* v. *Hughes,* 1 Maule & Selw. 593. These latter
cases have been followed in *England* by the Common
Pleas, sustained on error in the Exchequer Chamber, in the
case of *The Gas Light and Coke Company* v. *Turner,* 5
Bingham's N. C. 666 (35 En. Com. Law), 6 Bingham's N.
C. 320 (37 En. Com. Law.)

This conflict in the *English* cases is ably commented upon
by *Chief Justice Robertson,* in the case of *Steele* v. *Curle,* 4
Dana's Rep. 381. After noticing the conflict he says:

" Such being the diverse views and opinions of some of
the more prudent and respected of those most learned in
jurisprudence, it might be deemed rash in this court now
to express a conclusive opinion on the points which have
been so ably discussed by others, who, on each side of the
controversy, seem to be sustained by specious and imposing
arguments, uncontrolled by positive authority. But, with-
out engaging in the argument, or intending even to express
a definitive opinion—which, as will presently be seen, is
not now necessary—we feel that it may be but proper to
suggest, in passing, that we would be inclined neither to
concur with, or to dissent from, the doctrine of either party,
*in extenso* and altogether, without limitation or qualification;
but should rather incline to the conclusion, that, although,
as we are disposed to think, a *simple knowledge,* by a vendor,
of the fact that the vendee buys an article for the purpose,
or with an intention, of using it in violation of the public
law, or a principle of moral rectitude, may, *in strong and
flagrant cases,* such as that supposed by *Chief Justice Eyre,*
be a sufficient reason for withholding, from either party the
aid of the law for enforcing the contract, yet there may be
cases of a lighter shade, or less degree of enormity, in
which the same fact might not, *alone,* be entitled to the
same effect; and in the latter class, we would be inclined to

place the beer case decided by *Lord Ellenborough.* And the reason why we should be disposed to make any discrimination in consequence of the color or degree of the transgression contemplated by the buyer, and merely understood by the seller, and why, also, we are inclined to agree with *Chief Justice Eyre to some extent,* is just because it does seem to us that no one can sell a commodity, knowing that the buyer intends to use it for any purpose so flagitious as that of murder or treason, or other *flagrant* violation of the *fundamental* rights of man, or of society, without betraying such a degree of turpitude and recklessness as to implicate him *as a voluntary and active participant* in the unlawful design, and, as therefore, *quantum in illo,* willing and instigating a crime, which it is the *civil duty* of every citizen to *oppose;* and that the like knowledge alone, of the buyer's purpose of unlawful appropriation or use, would not, necessarily, lead to the like deduction as to the motive or conduct of the seller in every case of inferior degree, as the beer case; the case of the purchase of an article with the intention of again making a fraudulent sale or use of it; the case of a loan of money to a person who borrows for the purpose of re-loaning to a stranger at illegal interest; the case of the sale of merchandise by a wholesale merchant, in the regular course of his business, to one who, when he buys, intends to smuggle it into a foreign port, without paying the legal and accustomed duties; and many other cases of a similar kind, in which a citizen may be *neutral,* without being guilty of any *incivism,* or of any intentional participation in the unlawful design. In all such cases, it would seem to us, that in a commercial, busy and enterprising age, *the law* should not attempt to establish a morality so pure, and exact, and vigilant, as that which would make it the *legal duty* of every seller, of every vendible thing, to become a *casuist or censor,* so far as to make him responsible for the *known motives* of the buyer, and an *active* and *guilty co-operator* with him in his *contemplated* violation of *law,* of *principle,* or of *justice.*"

We think it safe to say, that in all cases of a contemplated *felony*, where the act of selling is under such circumstances as would make the seller an accessory before the crime, he cannot recover from the buyer the purchase money of the thing so sold.

A late writer has attempted to state the true principle to be deduced from these and other conflicting authorities, in the following section: "But the mere fact that the seller knows that the goods sold will be applied to an unlawful purpose, will not ordinarily be sufficient to deprive him of his right to payment therefor; he must be, in some manner, implicated in the transaction, and privy thereto. And therefore, it has been held that it is no defence to an action brought to recover the price of goods sold, that the vendor *knew* that they were bought for an illegal purpose, provided that it was not made a *part of the contract* that they should be used for that purpose, and provided, also, that the vendor has done nothing in aid or furtherance of the unlawful design, beyond the mere sale with the knowledge of the illegal intent of the purchaser. The test whether a demand connected with an illegal transaction is capable of being enforced at law, is to be found in the question, whether the contract, on which the claim is founded, can be wholly disconnected from the illegal transaction, or whether it was in furtherance thereof. *Wherever goods have been sold for the express purpose of enabling a party to violate the law, the sale has been held to be void.*" Perkins' Ed. of Story on Sales, § 506.

The sentence in italics is susceptible of an interpretation that would embrace every selling, where the seller *knows* that the thing sold is to be used for an illegal purpose; but we presume the author intended this statement to be understood in a limited sense, so as to make it consistent with what precedes it.

The defence in the case at bar comes with an ill grace from the appellant. He was the party who intended to violate the law; he got the property of the plaintiff below; he does not attempt to rescind the contract by offering to

return it, but holds it, and attempts to defeat the recovery for the purchase money, on the ground that the contract is against public morals. It may be so, but a reward for his dishonesty would not, in our opinion, tend to promote that which he has been instrumental in corrupting.

The judgment is affirmed, with 5 per cent. damages and costs.

*J. R. Coffroth* and *D. O. Daily,* for appellant.

*W. C. Kocher,* for appellee.